[840 NYS2d 36]

Claire Van Kipnis, Appellant, v Gregory Van Kipnis, Respondent.

First Department, July 12, 2007

**APPEARANCES OF COUNSEL**

*Berkman Bottger & Rodd, LLP*, New York City (*Walter F. Bottger, Amelia Nickles* and *Elizabeth A. Fox* of counsel), for appellant.

*Gartner & Bloom, P.C.*, New York City (*Stuart F. Gartner* and *Arthur P. Xanthos* of counsel), for respondent.

### OPINION OF THE COURT

GONZALEZ, J.

On this appeal we must decide whether a 1965 prenuptial agreement, which was executed by the parties in France and provides for a "separation of estates" property regime, is enforceable by the husband to preclude equitable distribution of the parties' separately owned assets upon their divorce. The inquiry is complicated by the fact that the terms of the agreement appear inconsistent with the parties' stated intent, as disclosed through extrinsic evidence. We find that because the unambiguous language of the agreement calls for each spouse to retain ownership of all property held at the time of marriage or acquired thereafter in any manner, the trial court correctly held that all separately owned property should be distributed according to title and excluded from equitable distribution. We also find that the court's awards of maintenance and attorneys' fees to the wife were proper exercises of discretion and should not be disturbed.

Plaintiff wife and defendant husband were married in Paris, France, in 1965. At the time, the wife, a Canadian citizen, was studying at the Sorbonne and the husband, a citizen of the United States, had just finished college. Prior to the marriage ceremony, and at the specific request of the wife, the parties agreed to execute a "Contrat de Mariage" (Contract), which is a

form of prenuptial agreement under the French Civil Code. The wife made all the arrangements for the Contract, including securing the presence of a "Notaire," the French official who presides over the execution of such contracts, and obtaining an American attorney and interpreter to protect the husband's interests. The expressly stated purpose of the Contract was to opt out of the "community property regime," which is the custom in France, in favor of a "separation of estates" property regime. The first article of the Contract, which is titled "MARITAL PROPERTY SYSTEM," provides:

> "The future spouses declare that they are adopting the marital property system of separation of estates, as established by the French Civil Code.

> "Consequently, each spouse shall retain ownership and possession of the chattels and real property that he/she may own at this time or may come to own subsequently by any means whatsoever.

> "They shall not be liable for each other's debts established before or during the marriage or encumbering the inheritances and gifts that they receive.

> "The wife shall have all the rights and powers over her assets accorded by law to women married under the separate-estates system without any restriction."

Shortly after they were married, the parties moved to New York, where they exclusively resided throughout their 38-year marriage. The husband, a trained economist, secured employment in the finance industry, where he enjoyed a successful and highly profitable career. The wife worked as a professor at Cooper Union until 1978, and then as a cultural counselor for the Quebec Government in New York until 1986. The wife was also primary caretaker for the parties' two children, now adults, and maintained the marital household.

During their respective careers, the husband acquired liquid assets of approximately $7 million and the wife of approximately $700,000 to $800,000 (which includes an inheritance from a relative). Consistent with their 1965 selection of a separate property regime, the parties held these liquid assets in their own separate bank and brokerage accounts. Indeed, the parties kept their assets completely separate throughout the course of their 38-year marriage, the only exception being when the wife was granted signing privileges on one of the husband's accounts

while he was temporarily out of the country. However, the parties did jointly own two properties, a country home in Lenox, Massachusetts, purchased in 1988 and presently valued at $625,000, and a cooperative apartment at 860 Fifth Avenue, in Manhattan, purchased in 1998 and valued at $1.8 million.

In March 1999, the wife moved into the co-op apartment, but the husband did not join her. Instead, he sent a note saying that he wanted a divorce. Shortly thereafter, the husband commenced a divorce action in New York, but he did not mention the Contract in his complaint or at any other time during the pendency of that action. After an attempt at mediation failed, the husband discontinued the New York action and commenced a new divorce action in Massachusetts in January 2001. During the pendency of the Massachusetts action, the husband again never mentioned the Contract, and, in opposing the wife's motion to dismiss, even stated that the parties' assets were subject to equitable distribution. In April 2002, the Massachusetts action was dismissed for lack of jurisdiction. The husband then commenced a second Massachusetts action, which resulted in an ex parte, no-fault divorce, with economic issues referred to New York, where the wife had commenced this action for divorce and ancillary relief.

After 18 months of discovery, the case was referred to a referee for trial. Before it began, however, the husband allegedly discovered the Contract in a file in the co-op apartment, and moved to amend his answer to assert it as a defense to equitable distribution. In a December 3, 2003 order, Supreme Court granted the husband's motion and, in 2004, this Court unanimously affirmed (8 AD3d 94 [2004]).

After the appeal, the trial court again referred the issues of equitable distribution, maintenance and legal fees to a Referee. Recognizing that equitable distribution could not be definitively resolved until the issue of the enforceability of the Contract was determined, the Referee directed that the wife had the initial burden of showing that the Contract was either inapplicable or not enforceable. At the hearing, the wife testified that the Contract was executed for the sole purpose of opting out of the community property system of France, and instead adopting a complete separation of estates, whereby each party could not be held liable for the other's debts. She also admitted, however, that the husband executed the Contract at her insistence, that he had no money at the time of the marriage and that she had never moved to set the Contract aside during the marriage.

The husband offered a similar understanding of the Contract in his testimony. Defendant testified: "I didn't realize it was a prenuptial agreement. I just thought I had a marriage contract, which meant that we decided to protect ourselves from creditors, and we decided to keep our assets in separate names, and I never drew the conclusion that this had relevance in a divorce proceeding."

In addition, both parties called expert witnesses on marriage contracts under French law. The husband's expert testified that article 1536 of the French Civil Code provides different choices of matrimonial regimes; that by signing the Contract the parties opted out of France's community property regime and chose a regime of separate property; that the legal effect of this selection was that each spouse retained the unfettered right to administer, enjoy and freely dispose of his or her separate property throughout the marriage and continuing through its dissolution; and that divorce is never mentioned in a marriage contract. His ultimate opinion was that the Contract was legally binding and enforceable. The wife's expert generally agreed with his counterpart's assertion that when the parties sign a marriage contract choosing a separate property regime, that is the regime that must be followed.

In its report dated July 1, 2005, the Referee upheld the Contract, finding that "it is clear that these parties entered into a prenuptial agreement . . . which governed the economics of their 38 year marriage, and is likewise applicable in the circumstances of their divorce." Thus, the Referee determined that the parties were to retain ownership of the assets held in their respective names. With respect to the jointly held properties, the Referee recommended that the wife be awarded the co-op apartment and reimbursed $75,000 for repairs and furnishings therein, and that the husband be awarded the Massachusetts country home.

The Referee also ruled that the Contract did not constitute a waiver by the wife of the right to receive maintenance. In determining the amount and duration of maintenance, the Referee considered, inter alia, the marital standard of living, which it described as "relatively modest," in arriving at a sum of $7,500 per month, payable until either the husband or wife dies or the wife remarries. In addition, after subtracting the amount of fees allegedly attributable to the wife's challenge to the Contract, which it found were not compensable, the Referee awarded the wife an additional $92,779 in attorneys' fees, considerably less than she had requested.

The wife moved to disaffirm the report and the husband cross-moved to affirm. The wife maintained that the intent of the Contract was to keep each spouse's property separate in order to avoid the claims of creditors, and that it was not intended to apply to divorce proceedings. The husband relied on the plain language of the agreement calling for separate ownership of property. In an order dated November 15, 2005, the court confirmed the Referee's finding that the Contract is valid and enforceable, and applicable to this proceeding. It rejected the wife's argument as belied by the language of the Contract itself, reflecting the parties' unequivocal choice to have their property rights determined by the separate property regime. The court also upheld the Referee's recommendations regarding maintenance, distribution of the jointly owned properties and legal fees. On January 26, 2006, judgment was entered.

On appeal, the wife argues that the enforceability of the Contract is irrelevant since, even if enforceable, it is not applicable to this divorce proceeding, since the intent was to shield each spouse's assets from the other's creditors during the marriage, and not to govern the distribution of property upon divorce. She notes that although the Contract specifically provides that each spouse "shall not be liable for each other's debts established before or during the marriage," it makes no mention of the disposition or distribution of property in the event of divorce, and contains no express waiver of property rights if the parties decided to divorce. She also notes that both parties testified that neither of them understood the Contract as having any relevance to divorce.

The husband responds that the Contract is an unambiguous prenuptial agreement calling for totally separate property, and that it should be enforced according to its terms. Although the husband urges that the parties' extrinsic evidence need not be considered since their intent can be gleaned from the "four corners" of the Contract, he also relies, inconsistently, on his expert's testimony that the contract is applicable to distribution of property in divorce proceedings.

Because the Contract unambiguously provides for separate ownership of property and extrinsic evidence should not have been considered to create an ambiguity or vary its terms, we affirm that portion of the order which found the Contract to be enforceable and applicable herein.

In New York, there is a "strong public policy favoring individuals ordering and deciding their own interests through

contractual arrangements" (*Bloomfield v Bloomfield*, 97 NY2d 188, 193 [2001] [internal quotation marks omitted]). Thus, "[d]uly executed prenuptial agreements are accorded the same presumption of legality as any other contract" (*id.*). Because there is no dispute between the parties that the Contract was executed with proper formalities, the sole issue to be decided here is whether the Contract, by its terms, is applicable to the distribution of the parties' property in the instant divorce proceeding. We turn to the settled rules of contract interpretation for the answer.

Two fundamental principles of contract interpretation are that "agreements are construed in accord with the parties' intent," and that "[t]he best evidence of what parties to a written agreement intend is what they say in their writing" (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002] [internal quotation marks omitted]). "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (*id.*). "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion" (*id.* [internal quotation marks and brackets omitted]).

Extrinsic evidence of what the parties really intended is generally inadmissible, and will be considered only if the agreement is found to be ambiguous, which is an issue of law for the court (*id.,* citing *W.W.W. Assoc. v Giancontieri,* 77 NY2d 157, 162 [1990]). However, extrinsic evidence may not be utilized to create an ambiguity that would otherwise not exist, since "before looking to evidence of what was in the parties' minds, a court must give due weight to what was in their contract" (*W.W.W. Assoc.* at 162). An omission or mistake in a contract, such as a failure to include a specific contingency, does not itself create an ambiguity (*see Reiss v Financial Performance Corp.*, 97 NY2d 195, 199 [2001]).

Here, the Contract provides that the parties were "adopting the marital property system of separation of estates" under which each was to retain ownership of the property that he or she owned at the time "or may come to own subsequently by any means whatsoever," and were not to be liable for each other's debts "established before or during the marriage." In our view, this broad and unconditional language is susceptible of only one reasonable interpretation, namely, that the parties

chose to have a separate property regime govern the economics of their marriage without any durational limitation, contingencies or exceptions. As written, therefore, the Contract mandates that any and all property separately owned by a party before or during the marriage would remain unalterably as such throughout the course of the marriage.

We find no basis within the four corners of the Contract to read into it any implied agreement to alter or limit this freely chosen separate property regime in the event of a divorce. Indeed, the mere fact that the parties entered into a formal prenuptial agreement to maintain separate property, without any reservation of rights or exceptions regarding divorce or the death of a spouse, indicates that their selection of a separate property system was unconditional. While the parties may not have considered all of the ramifications of their 1965 selection of separate estates, any such failure is not a ground to avoid the clear terms of the Contract. In short, there is no basis for concluding that the separate property system was to be limited to the period when the marriage was thriving, and automatically suspended once a divorce complaint was filed.

It is also significant that although the parties' choice of a separate property regime occurred over 40 years ago, they essentially ratified this selection by keeping their assets in separate accounts throughout the course of the marriage. For 40 years, the parties declined to share ownership of liquid assets despite being married to each other, and each considered their individually owned assets as his or hers alone. Thus, while the wife argues that the Referee and court ignored the presumption under New York law that property acquired during the marriage is marital in nature (citing *DeLuca v DeLuca*, 97 NY2d 139, 144 [2001] and *DeJesus v DeJesus*, 90 NY2d 643, 648 [1997]), both the Contract's language and the parties' conduct during the marriage squarely defeat such presumption in this case.

The wife's attempt to narrow the scope of the Contract based on *Bloomfield v Bloomfield* (97 NY2d 188 [2001], *supra*) is not persuasive. In *Bloomfield*, the agreement explicitly waived all rights to distribution of property but did not address the issue of maintenance. Although the husband argued that the waiver should be interpreted broadly to include maintenance, the Court of Appeals disagreed, finding that a waiver of rights to the husband's property, "without more, does not constitute a waiver of the right to receive support" (*id.* at 193). The wife analogizes

to *Bloomfield*, arguing that since the Contract does not explicitly waive, or even mention, the distribution of property in the event of divorce, it cannot be construed to apply to divorce. The analogy is weak. The point of *Bloomfield* is that a waiver of property rights, that is, a waiver of any ownership rights to property acquired before or during the marriage, could not be extended to cover the conceptually distinct right to receive maintenance, which has nothing to do with ownership of property. Here, in contrast, the Contract clearly and unambiguously relates to ownership rights of property acquired before or during the marriage, and such ownership rights are at the core of the issue being litigated in this case, namely, the distribution of separately owned property upon dissolution of the marriage.

Similarly inapplicable are cases holding that prenuptial agreements that include a spouse's waiver of property rights in the event of the other spouse's death do not apply to the event of divorce (*see e.g., Ventimiglia v Ventimiglia*, 307 AD2d 993 [2003]; *Carrasco v Carrasco,* 301 AD2d 553 [2003]). In those cases, the *Bloomfield* principle that a prenuptial agreement will not be given effect beyond its clear provisions is appropriate since, by specifically mentioning the contingency of death, the parties impliedly rejected other contingencies. This case is different, however, since the Contract broadly provides for separate ownership of property, with no limitations or contingencies. Thus, reading the Contract as governing all matters involving the parties' property ownership is perfectly consistent with its language (*cf. Greenfield v Philles Records*, 98 NY2d 562 [2002], *supra* [artists' transfer of full ownership rights to master recordings carries with it unconditional right to redistribute performances in new technological formats, absent explicit reservation of rights]).

The consequences of a clear and unequivocal election of a separate property regime are aptly illustrated by this Court's decision in *Roos v Roos* (206 AD2d 293 [1994]). In *Roos*, the parties executed a prenuptial agreement in 1975, five years before the effective date of New York's Equitable Distribution Law. The agreement provided that each spouse had the "absolute right" to manage or dispose of any property now separately owned or subsequently separately acquired, and that the wife waived and released all rights and interest in the husband's property (*id.* at 294). The wife also expressly agreed "to accept the provisions set forth in this agreement in place of all rights in the property and estate of [husband], either as his wife during his lifetime,

or as his widow, heir at law or distributee upon his death" (*id.* at 294).

When the husband in *Roos* relied on the prenuptial agreement as a defense to equitable distribution, the wife moved to dismiss such defense. The motion court determined that the parties' agreement was not intended as a "complete settlement of their property rights" (*id.* at 294), and dismissed the defense. This Court unanimously reversed, holding that the language of the agreement clearly evinced "the parties' intention that their property rights be governed according to title," such that any property rights that might otherwise accrue by reason of the marriage or survivorship were forfeited (*id.* at 295; *see also Moor-Jankowski v Moor-Jankowski*, 222 AD2d 422, 422-423 [1995] [wife waived any right to husband's retirement benefits in prenuptial agreement]; *cf. Housset v Housset*, 200 AD2d 508 [1994] [court properly gave effect to French prenuptial agreement which required an equal division of assets]).

The language of the Contract in this case likewise reflects a clear and unequivocal choice by the parties to have property rights determined by title. As noted, it mandates that each spouse retain ownership of separately owned property acquired before or during the marriage, and that the wife had unfettered freedom to manage or dispose of her separate property. Although, as the wife notes, the Contract lacks a clear and unequivocal waiver of property rights by her, as in *Roos*, her unconditional agreement to have property rights determined by title notwithstanding the parties' marriage effectively constitutes such a waiver.*

Extrinsic evidence of the parties' intent should not have been admitted in the absence of a judicial finding that the agreement was ambiguous (*Greenfield*, 98 NY2d at 569), a finding never made in this case. However, for reasons of "judicial economy," the Referee heard testimony from the parties and their French law experts on the issue of intent. Ultimately, however, both the Referee and the court concluded that the plain language of the Contract was sufficient to defeat any contrary evidence of

---

* It is also significant that in *Roos*, the agreement included the wife's specific waiver of any rights to the husband's property "either as his wife during his lifetime, or as his widow, heir at law or distributee upon his death" (206 AD2d at 294). It did not, however, include any reference to divorce. Accordingly, contrary to the wife's argument here, this Court has found a prenuptial agreement applicable to divorce notwithstanding its failure to expressly mention that specific contingency.

intent. Thus, the court's improper consideration of extrinsic evidence was harmless.

We also reject the wife's argument that the Contract should not be enforced because it is not "an agreement for the disposition of . . . property" within the meaning of Domestic Relations Law § 236 (B) (5) (a). Although the wife is correct that the Contract is not an agreement for the *disposition* of property, Domestic Relations Law § 236 (B) (3) authorizes enforcement of agreements that include "(2) provision for the *ownership, division or distribution* of separate and marital property" (emphasis added). Moreover, Domestic Relations Law § 236 (B) (1) (d) (4) defines "separate property" as including "property described as separate property by written agreement of the parties." Thus, the Domestic Relations Law specifically authorizes agreements to treat what might otherwise be marital property as separate property for purposes of equitable distribution. This is precisely what occurred in this case, where the Contract described each spouse's property held at the time of marriage or acquired thereafter as separate property, and accordingly, it should be treated as such for the purpose of equitable distribution.

With respect to maintenance, the wife argues that the court and Referee failed to consider, or improperly applied, the statutory factors listed in Domestic Relations Law § 236 (B) (6) (a) (1)-(11), and also erroneously characterized the marital standard of living. We disagree. The Referee's decision discusses all of the relevant statutory factors, including the gross disparity of total assets (husband, $7 million plus one-half interest in jointly owned homes; wife, $700,00 plus one-half interest in jointly owned homes), and the parties' anticipated retirement income. In addition, the Referee's characterization of the parties' marital lifestyle as "relatively modest" is explained in detail and finds support in the record. Thus, the court's award of $7,500 per month in maintenance, which would result in approximate annual pretax incomes of $126,000 for the wife and $335,000 for the husband, was a proper exercise of discretion (*Comstock v Comstock*, 1 AD3d 307, 308 [2003]).

Finally, we uphold the court's award of $92,779.57 in attorneys' fees to the wife. Although the wife requested an additional $177,000 in fees (the husband had already paid $160,000), the Referee correctly ruled that under Domestic Relations Law § 237 the wife was not entitled to fees incurred in challenging the enforceability of a prenuptial agreement (*Schapiro v Schapiro*, 204 AD2d 87 [1994]). Moreover, because the

legal bills submitted by the wife's attorney failed to clearly delineate those legal services that were unrelated to the wife's challenge to the agreement, and thus compensable under Domestic Relations Law § 237, the court properly exercised its discretion in awarding the amount that it did.

Accordingly, the judgment of the Supreme Court, New York County (Judith Gische, J.), entered January 26, 2006, inter alia, confirming the report of the Special Referee, declaring that the parties' prenuptial agreement is valid and enforceable, and awarding plaintiff $7,500 in monthly maintenance and $92,779.57 in attorneys' fees, should be affirmed, without costs.

KAVANAGH, J. (dissenting). Two facts are not in dispute in this otherwise particularly contentious matrimonial litigation. First, the parties never intended that this "Contrat de Mariage" executed in France more than 40 years ago would serve as an enforceable prenuptial agreement. The husband acknowledges as much and has given sworn testimony that he never believed that this document "had relevance in a divorce proceeding." As such, there is no ambiguity here—the parties' intent is not in question since neither ever intended that this document would define the distribution of their marital assets—and that leads to the second fact upon which we all agree. If this document is given a legal vitality that neither party ever envisioned or expected, it will lead to an unfair, even unconscionable distribution of assets accumulated during the marriage. It will be a windfall for the husband and will effect a result that is neither consistent with either party's understanding or with the laws of this State that govern the equitable distribution of marital assets. I would therefore reverse the order that this document is an enforceable prenuptial agreement and equitably distribute the parties' assets.

FRIEDMAN, J.P., NARDELLI and CATTERSON, JJ., concur with GONZALEZ, J.; KAVANAGH, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, entered January 26, 2006, affirmed, without costs.