**In re MUSICLAND HOLDING CORP., et al., Debtors.**

**Buena Vista Home Entertainment, Inc., a California corporation; Cargill Financial Services International, Inc., a Delaware corporation; Hain Capital Group, LLC, a Delaware limited liability company; Paramount Pictures Corporation, a Delaware corporation; Twentieth Century Fox Home Enter-** tainment LLC, a Delaware limited liability company; UBS Willow Fund, LLC, a Delaware limited liability company; and Varde Investment Partners, L.P., a Delaware limited partnership, Appellants,

v.

**Wachovia Bank, N.A., a national banking association, in its capacity as Agent; and Harris N.A., a national banking association, Appellees.**

No. 07 Civ. 8423.

United States District Court, S.D. New York.

May 22, 2008.

Pachulski Stang Ziehl & Jones LLP, by: Robert J. Feinstein, Esq., New York, NY, for Appellants.

Otterbourg, Steindler, Houston & Rosen, P.C., by: Richard G. Haddad, Esq., New York, NY, for Appellee.

*OPINION*

SWEET, District Judge.

The Appellants, trade creditors of Musicland, have appealed from the August 24, 2007 Memorandum Decision and Order Granting Motion to Dismiss Complaint (the "Memorandum Order") of Chief Judge Stuart Bernstein of the Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") dismissing their complaint in the above-captioned adversary proceeding (the "Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

The Complaint asserted seven causes of action, including a breach of contract claim arising out of an agreement (the "Intercreditor Agreement") between senior and junior secured creditors of the bankrupt debtor, Musicland Holding Corp. (together with its affiliates, "Musicland"). The Appellants, as junior creditors, alleged in their Complaint that Appellee Wachovia Bank, N.A. ("Wachovia"), as agent for the senior creditors, improperly amended the Intercreditor Agreement to include a term loan to Musicland by Appellee Harris N.A. ("Harris").

Upon the record presented and the conclusions set forth below, the Memorandum Order is affirmed.

***Prior Proceedings***

On January 25, 2007, Appellants filed a complaint (the "Original Complaint") in the United States District Court for the Southern District of New York (the "District Court") alleging the same claims as in this action. After Wachovia moved to dismiss the Original Complaint, the Appellants voluntarily dismissed the action and re-filed their claims as an adversary proceeding in the Bankruptcy Court, alleging federal question jurisdiction. The Complaint, filed in the Bankruptcy Court on May 15, 2007, asserts multiple claims for relief against Wachovia.

On June 15, 2007, Wachovia and Harris filed motions to dismiss the Complaint for failure to state a cause of action under Federal Rule of Civil Procedure 12(b)(6). The motions were heard on August 9, 2007, and on August 24, 2007, the Memorandum Order was issued. Final Judgment was entered against the Appellants on August 27, 2007.

This appeal from the Memorandum Order was heard on January 16, 2008.

***The Complaint***

Pursuant to a loan and security agreement dated August 11, 2003 (the "Revolving Credit Agreement"), Fleet Retail Finance, Inc. and Congress Financial Corporation (Wachovia's predecessor-in-

interest), as the agent for the Revolver Lenders, agreed to provide Musicland with revolving credit of, at that point, up to $200 million (the "Revolving Credit Facility"). The obligations thereunder were secured by a first priority lien in substantially all of Musicland's assets, including inventory and proceeds (the "Revolver Lien"). Compl. ¶ 23, Ex. A.

The Revolving Credit Agreement provided exclusively for revolving credit. It defines the "Credit Facility" as, in relevant part, the "Loans," and "Loans" are, in turn, defined as "the loans now or hereafter made by or on behalf of Lenders or by Agent for the account of Lenders on a revolving basis pursuant to the Credit Facility ...." Compl. Ex. A §§ 1.29, 1.70. The Revolver Lien secured the "Obligations," *id.* § 5.1, which are defined as "[a]ny and all Loans, Letters of Credit accommodations and all other obligations, liabilities and indebtedness of every kind, nature and description ... arising under this Agreement or any of the other Financing Agreements ....," *id.* § 1.80.

In 2003, Musicland was experiencing substantial financial difficulties. To induce Appellants to continue to supply music CDs, DVDs and similar inventory, Musicland granted them a lien on inventory and proceeds thereof (the "Inventory Lien"), pursuant to a security agreement dated November 5, 2003 (the "Security Agreement"). The Bank of New York acted as Appellants' collateral agent. Compl. ¶ 25, Ex. B.

Pursuant to the Security Agreement, the Inventory Lien was "subject only to the terms of that certain Intercreditor and Subordination Agreement, dated as of November 5, 2003 ...." Compl. Ex. B § 2. The Inventory Lien was junior only to "Permitted Encumbrances," *id.* § 4(b), which include only "the security interests and liens of Congress for itself and the benefit of the Lenders pursuant to the Congress Facility" and certain other limited, inapplicable liens, *id.* § 1(i).

Concurrently with the Security Agreement, Wachovia, as agent for the Revolver Lenders, and Bank of New York, as Appellants' collateral agent, entered into the Intercreditor Agreement. Compl. ¶ 28, Ex. C.

The definitions of the Intercreditor Agreement provide for the subordination of the Inventory Lien solely to the loans made under the Revolving Credit Agreement. Section 2.2 of the Intercreditor Agreement states that the Inventory Lien is subordinated only to the "Liens of the Revolving Loan Creditors therein to the full extent of the Revolving Loan Debt." Compl. Ex. C. § 2.2. "Revolving Loan Creditors" are defined as parties to the Revolving Credit Agreement, *id.* § 1.15. "Revolving Loan Debt" is defined as "any and all obligations ... arising under the Revolving Creditor Agreements ...." Compl. Ex. C § 1.16.

"Revolving Creditor Agreements" are defined as the original revolving loan documents, as they "now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured (in whole or in part and including any agreements with, to or in favor of any other lender or group of lenders (which lenders or group of lenders shall not be affiliates of Debtors, except that Trade Agent and Trade Creditors shall have no objection to any .Permitted Affiliate Refinancing) that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt or is otherwise a party to the Revolving Creditor Agreements)." *Id.* § 1.11. Under Section 1.9, a "Permitted Affiliate Refinancing" is one in which an affiliate, *inter alia,* "makes Revolving Loan Debt available to the Debtors ... *provided, that,* (a) such affiliate does not own or hold more than

twenty-five (25%) percent of the Revolving Loan Debt subject to such Refinancing ...." Compl. ¶ 31, Ex. C § 1.9.

"Lenders," as defined in the Revolving Credit Agreement, comprised (a) the original Revolver Lenders, and (b) lenders that acquired a participation interest in the Credit Facility from an original Lender. Compl. Ex. A §§ 1.66, 13.6.

Finally, the Intercreditor Agreement provides, in relevant part, under the heading "Waivers":

> The Trade Creditors also waive notice of, and hereby consent to, (a) any amendment, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements, including, without limitation, extensions of time of payment of or increase or decrease in the amount of the Revolving Loan Debt, the interest rate, fees, other charges, or any collateral, (b) the taking, exchange, surrender and releasing of Trade Collateral or guarantees now or at any time held by or available to Revolving Loan Agent or any of the Revolving Loan Creditors for the Revolving Loan Debt .... Any of the foregoing shall not, in any manner, affect the terms hereof or impair the obligations of Trade Creditors hereunder.

*Id.* § 4.3.

In the fall of 2005, Musicland asked the Revolver Lenders to increase availability under the Revolving Credit Facility, but they refused. Musicland's parent, Sun, also refused to provide additional capital on a subordinated debt or equity basis. Compl. ¶ 32.

Harris had a banking relationship with Sun. At Sun's request, Harris agreed to make a $25 million term loan to Musicland (the "Harris Term Loan"), on materially different terms from those of the existing credit facility: (i) it was a term loan, not revolving credit; (ii) Sun guaranteed re-payment to Harris (but not to the Revolver Lenders); and (iii) it was short-term financing designed to meet Musicland's liquidity needs during the peak shopping season and would be repaid shortly, regardless of its stated maturity date, whether or not other Revolver Lenders were paid. Compl. ¶ 33.

The Security Agreement prohibited Musicland from granting any lien encumbering Appellants' collateral, other than the Revolver Lien. Compl. ¶ 34. Wachovia and Harris devised Amendment No. 8, dated August 31, 2005, to the Revolving Credit Agreement, to incorporate the Harris Term Loan into the Revolving Credit Facility for the purpose of affording it a senior lien, superior to Appellants' Inventory Lien. Compl. ¶ 35, Ex, D.

The definition of "Obligations" in the Revolving Credit Agreement, which effectively limited the scope of the security interest to revolving loans, was amended so that "[a]ll references to the term 'Obligations' herein and in the Loan Agreement and the other Financing Agreements shall be deemed ... to include ... indebtedness of Borrowers in respect of the Term Loan." Compl. ¶ 36, Ex. D. § 1(b)(ix). Whereas before there had been only "Lenders" and all nomenclature ultimately referred to revolving loans and revolver lenders, Amendment No. 8 changed: (1) the definition of Loan (to mean the Revolving Loans and the Term Loan), *id.* § 1(b)(vii); (2) the definition of "Lenders" (to mean the Revolving Loan Lenders and the Term Loan Lender), *id.* § 1(b)(vii); and (3) the definition of "Commitments" (to mean the Revolving Loan Commitments and the Term Loan Commitment), *id.* § 1(b)(v).

The Harris Term Loan had its own interest rate, *id.* § 1(b) (ii), and was not paid *pari passu* with the revolving loans. Rather, loan payments were applied first

to the Revolving Loan Debt, including all interest and principal, and only then to interest and principal on the Harris Term Loan. *Id.* § 4 (amending § 6.4 of the Intercreditor Agreement). Although the stated maturity date of the Harris Term Loan was co-terminous with the Revolving Credit Facility, Amendment No. 8 permitted early prepayment at anytime after November 2005, provided that Musicland then had certain excess availability under the Revolving Credit Facility (*i.e.*, if it presented no risk to the Revolver Lenders). Compl. ¶ 35, Ex. D.

The maximum amount of the Revolving Loan Debt was limited under Section 2.1 of the Revolving Credit Agreement to the amount of the borrowing base, regardless of the stated maximum amount of the credit facility (and thus there would normally be an equity cushion in the collateral). Compl. Ex. A § 2.1(c). Amendment No. 8 retains that limitation. Compl. Ex. D § 2. The Harris Term Loan, however, was limited by the maximum credit limit of the Revolving Credit Facility. *Id.*

On December 5, 2005, the Harris Term Loan was repaid in full. Shortly thereafter, the Revolver Lenders changed the borrowing base calculations and/or reserve requirements under the Revolving Credit Facility, and Musicland was thrust into a liquidity crisis. On January 12, 2006, Musicland filed for relief under Chapter 11 of the Bankruptcy Code. Compl. ¶ 37.

The Appellants' claims were substantially under-secured by their Inventory Lien. Pursuant to an order dated March 24, 2006, the Court approved the sale of substantially all of Musicland's remaining assets to a third-party purchaser, which sale was consummated on or about March 27, 2006. Out of the sale proceeds, the Revolver Lenders' claims were paid in full, and pursuant to a subsequent Court order entered on August 11, 2006, approximately $26 million was paid by Musicland to cer-

tain secured trade creditors on account of their secured claims, which aggregated to no less than between $170–$173 million (as estimated by Musicland). As of November 27, 2006, Musicland held $28.35 million in cash. By order entered December 2, 2006, the secured trade creditors were authorized to foreclose on $15.7 million of such funds. Based on information and belief, and the Debtor's filed Monthly Operating Statement for January 2007, Musicland holds no more than approximately $11.9 million in cash, with combined current assets (including cash) totaling approximately $22.1 million. Compl. ¶ 38.

Based on these allegations, the Complaint alleges seven causes of action: (i) breach of the Intercreditor Agreement, Compl. ¶¶ 39–43; (ii) breach of the covenant of good faith and fair dealing arising out of the Intercreditor Agreement, *id.* ¶¶ 44–48; (iii) tortious interference with contractual relations, with regard to the Intercreditor Agreement, *id.* ¶¶ 49–54 and (iv) with regard to the Security Agreement, *id.* ¶¶ 55–60; (v) conversion, *id.* ¶¶ 61–66; (vi) aiding and abetting conversion, *id.* ¶¶ 67–70; and (vii) unjust enrichment, *id.* ¶¶ 71–75.

### The Opinion Below

The Bankruptcy Court held that "the Intercreditor Agreement unambiguously authorized Wachovia to amend the Revolving Credit Agreement to bring in a term lender." *Buena Vista Home Entm't, Inc. v. Wachovia Bank, N.A. (In re Musicland Holding Corp.),* 374 B.R. 113, 121 (2007). There being no breach of the Intercreditor Agreement, the Court also dismissed the conversion and tortious interference claims, which were related to the breach of contract claim. *Id.*

In reaching its decision, the Bankruptcy Court looked to Section 2.2 of the Intercreditor Agreement, which provides for the subordination of the Appellants' liens

to the "Liens of the Revolving Loan Creditors therein to the full extent of the Revolving Loan Debt." *Id.* at 116. Next, the Bankruptcy Court turned to the agreements' definitions, "the net effect of which," observed the Bankruptcy Court, "provided that the Lenders' priority extended to debts under the current Revolving Credit Agreement, and any amended agreement, including any new loans of any type made under any amended agreement." *Id.* Beginning with the definition of "Revolving Loan Creditors," the Bankruptcy Court traced the language of the Intercreditor Agreement to support its conclusions:

> For example, the "Revolving Loan Creditors" referred to the Lenders under the Revolving Creditor Agreement, their successors and assigns and 'any other lender or group of lenders that any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt or is otherwise a party to the Revolving Creditor Agreements.' ([Intercreditor Agreement] at § 1.15). The 'Revolving Creditor Agreements' meant the 'Revolving Loan Agreement' and all agreements subsequently executed by 'the Debtors or any other person to, with or in favor of Revolving Loan Creditors in connection therewith or related thereto' as now exist 'or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured,' (*Id.* at § 1.11.) The 'Revolving Loan Debt' referred to 'any and all obligations, liabilities and indebtedness of every kind, nature and description' owed by the Debtors 'whether now or existing or hereafter arising' under the Revolving Creditor Agreements.

*Buena Vista,* 374 B.R. at 116. Based on these definitions, the Bankruptcy Court concluded that the Intercreditor Agreement contemplated future amendments to the Revolving Credit Agreement that could include loans or obligations of any kind.

The Bankruptcy Court further relied upon Section 4.3 of the Intercreditor Agreement, which stated that the Appellants and/or their predecessors gave their prior consent to all amendments of the Revolving Credit Agreement and placed only one restriction on what the Lenders could and could not do with respect to amendments. Specifically, the Debtors' affiliates could not be made Lenders under the Revolving Credit Agreement, except in certain instances. *Id.* at 117 (citing § 1.1 of the Intercreditor Agreement).

Construing the above-cited provisions as a whole, the Bankruptcy Court concluded that there was no restriction in the Intercreditor Agreement limiting the obligations to revolving debt. The Bankruptcy Court observed that the Appellants consented to any amendments to the Revolving Credit Agreement and, accordingly, the Bankruptcy Court ruled that "the Intercreditor Agreement unambiguously authorized Wachovia to amend the Revolving Credit Agreement to bring in a term lender." *Id.* at 121.

The Bankruptcy Court rejected the contention that the Appellants " 'bargained for a lien that was subordinate only to obligations under Musicland's existing revolving credit facility.' " *Id.* "That bargain," ruled the Bankruptcy Court, "is not reflected in the terms of the Intercreditor Agreement, which gave Wachovia a broad right to amend the Revolving Credit Agreement to cover any type of loan. If the Plaintiffs harbored such an expectation, it remained a secret one, contradicted by the language they agreed to in their contract." *Id.*

### Standard of Appellate Review

A district court reviews a bankruptcy court's conclusions of law *de novo,* while findings of fact are reviewed for

clear error. *Gulf States Exploration Co. v. Manville Forest Prods. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1388 (2d Cir.1990); Fed. R. Bankr.P. 8013. The dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is subject to *de novo* review. *See Mosello v. ALI, Inc. (In re Mosello)*, 193 B.R. 147, 149 (S.D.N.Y.1996) (*citing In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir.1990), *cert. denied, Air Line Pilots Ass'n, Int'l, AFL–CIO v. Shugrue*, 502 U.S. 808, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991)). Contract interpretation, in particular, is generally a matter of law, subject to *de novo* review. *United States v. Barrow*, 400 F.3d 109, 117 (2d Cir.2005); *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir.1996) ("[W]hether a written contract is ambiguous is a question of law for the trial court whose determinations will be reviewed *de novo*"); *cf. In re Ionosphere Clubs, Inc.*, 922 F.2d at 988 ("This court exercises the same review over the district court's decision that the district court may exercise [over the bankruptcy court's decision].") (citation omitted).

### Amendment No. 8 Was Authorized by the Intercreditor Agreement

■ The Bankruptcy Court accurately centered on the principal issue, the propriety of Amendment No. 8 in extending the Lenders' priority to the Harris Loan. In concluding that that Amendment No. 8 was proper, the Memorandum Opinion properly construed the Intercreditor Agreement.

In Section 2.2 of the Intercreditor Agreement, the Appellants and/or their predecessors agreed that their liens would always be "subordinate to the Liens of Revolving Loan Creditors ... to the full extent of the Revolving Loan Debt." Section 1.16 of the Intercreditor Agreement stated:

Revolving Loan Debt shall mean any and all obligations, liabilities and indebtedness of every kind, nature and description owing by Debtors to Revolving Loan Creditors and/or their respective affiliates or participants ... arising under the Revolving Creditor Agreements, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the Revolving Creditor Agreements ... whether direct or indirect, absolute or continent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and whether arising directly or howsoever acquired by Revolving Loan Creditors.

Compl. Ex. C § 1.16.

Other than prohibiting affiliated financing, the Intercreditor Agreement contained no restrictions on who could become a lender or how one could become a lender. Indeed, Section 1.15 of the Intercreditor Agreement defined "Revolving Loan Creditors" as:

Each of the financial institutions from time to time party to the Revolving Loan Agreement as lenders, and their respective successors and assigns (and including any other lender or group of lenders that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt or is otherwise party to the Revolving Creditor Agreements).

Compl. Ex, C § 1.15.

The Intercreditor Agreement states: "As used above and in this Intercreditor Agreement, the following terms shall have the meanings ascribed to them below." Compl. Ex. C at 2. Furthermore, Section 5.10 of the Intercreditor Agreement acknowledges that it is a fully-integrated agreement whose terms prevail over any conflicting provision in the Revolving

Credit Agreement or any related contract. Compl. Ex. C at 14.

Section 1.13 of the Intercreditor Agreement recognized, without limitation, that the underlying loan agreement could be "amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured." Compl. Ex. C § 1.13.

Under Section 4.3, the Appellants and/or their predecessors consented to all amendments to the Revolving Credit Agreement without any limitation on the loans that could be provided or who (other than an affiliate) could provide them:

> Trade Creditors also waive notice of, and hereby consent to, (a) any amendments, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements, including, without limitation, extensions of time of payment of or increase or decrease in the amount of any of the Revolving Loan Debt, the interest rate, fees, other charges, or any collateral.

Under these provisions, the Revolving Credit Agreement and the Intercreditor Agreement permitted an amendment allowing a new lender to provide funds such as those provided by Harris.

The Appellants contend that Amendment No. 8 was not contemplated by the use of the term "amendment" or any other term in Section 4.3 and urge a construction of the Intercreditor Agreement based upon their alleged expectation that the Revolving Credit Agreement would not be amended except for "routine" matters, Appellants' Br. at 8, 35, since the "fundamental purpose" of the Intercreditor Agreement was the "protection of Appellants' lien priority," *id.* at 25, and preservation of an "equity cushion in the collateral," *id.* at 15.

However, the Intercreditor Agreement fails to express such an intent or purpose.

Instead, the Intercreditor Agreement sets forth the purpose of the agreement as to (i) confirm the relative priority of the security interests of Wachovia and the Appellants, and (ii) provide for the orderly sharing of collateral proceeds among Wachovia and the Appellants. Compl. Ex. C. at 1.

Section 1.16 of the Intercreditor Agreement defines the priority "Revolving Loan Debt" to include, among other things, all obligations owed to Wachovia and the other Lenders by Musicland under the Revolving Credit Agreement, whether "secured or unsecured." Wachovia and the Lenders were free to extend credit to Musicland beyond the value of the collateral securing Musicland's repayment obligations.

As the Bankruptcy Court noted, "if the unambiguous terms of the Intercreditor Agreement gave Wachovia the right to enter into Amendment No. 8, both defendants are entitled to an order dismissing the complaint." *Buena Vista,* 374 B.R. at 120. Whether or not a contract is ambiguous is a matter of law, properly decided on a motion to dismiss. *See Crane Co. v. Coltec Indus., Inc.,* 171 F.3d 733, 737 (2d Cir.1999). "An ambiguity exists where the terms of a contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's,* 136 F.3d 82, 86 (2d Cir.1998) (*quoting Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir. 1997)). In the absence of any ambiguity, it is a maxim of contractual construction that a contract must be construed according to the expressed intent of the parties. *See, e.g., British Int'l Ins. Co. v. Seguros La*

*Republica, S.A.,* 342 F.3d 78, 82 (2d Cir. 2003).

██ Under New York law, "before looking to evidence of what was in the parties' minds, a court must give due weight to what was in their contract." *Van Kipnis v. Van Kipnis,* 43 A.D.3d 71, 840 N.Y.S.2d 36, 41 (App.Div.2007) (*quoting W.W.W. Assocs., Inc., v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)). "An omission or mistake in a contract, such as a failure to include a specific contingency, does not itself create an ambiguity." *Id.* (*citing Reiss v. Financial Performance Corp.,* 97 N.Y.2d 195, 199, 738 N.Y.S.2d 658, 764 N.E.2d 958 (2001)). While Appellants could have, and perhaps should have, included language specifically restricting Wachovia's ability to incorporate a term loan into the Revolving Credit Agreement by amendment, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Reiss,* 97 N.Y.2d at 199, 738 N.Y.S.2d 658, 764 N.E.2d 958 (internal quotation marks and citations omitted).

The Appellants have cited *Illco Toy Co. U.S.A. v. Block,* No. 90 Civ.1919(CSH), 1991 WL 64203 (S.D.N.Y.1991) and *Stone v. Golden Wexler & Sarnese,* 341 F.Supp.2d 189 (E.D.N.Y.2004) to support their assertion that the terms of the contract are ambiguous. In *Illco,* the Court construed a provision that could reasonably be understood as a "descriptive term and not one of limitation" in a two paragraph letter agreement that the Court recognized was not "a detailed manifestation of the parties' intent." *Illco,* 1991 WL 64203, at *4. The Intercreditor Agreement, unlike the letter agreement in Illco, is a fully-integrated agreement representing the "final expression" of the parties' agreement, which was negotiated by sophisticated parties with the assistance of skilled counsel, and its terms allow Wachovia to enter into Amendment No. 8.

In *Stone,* decided under Virginia law, the Court rejected a credit card company's argument that a "change-in-terms" provision allowed it to unilaterally change the terms of a consumer's credit card as it saw fit. *Stone,* 341 F.Supp.2d at 197–98. Wachovia did not change the terms of its contract with the Appellants. The changes to the Revolving Credit Agreement were made with the consent of Musicland, consistent with the Revolving Credit Agreement and the Intercreditor Agreement. The Intercreditor Agreement did, in fact, place a limitation on Wachovia's ability to amend the Intercreditor Agreement, indicating that the parties knew how to restrict Wachovia's ability to amend if they so desired.

Appellants have failed to establish that the Bankruptcy Court was in error with respect to its construction of the agreements relating to the authority to enter into the Amendment. The Bankruptcy Court correctly concluded that the language of the Intercreditor Agreement was unambiguous and according to its express terms, the Intercreditor Agreement authorized Wachovia to amend the Revolving Credit Agreement as it did in Amendment No. 8.

### Good Faith and Fair Dealing Requirements Do Not Alter the Intercreditor Agreement

██ The duty of good faith and fair dealing is a tool of interpretation that cannot be used to rewrite a contract and impose new terms. *Metropolitan Life Ins. Co. v. RJR Nabisco,* 716 F.Supp. 1504, 1519 (S.D.N.Y.1989); *see also Frutico S.A. v. Bankers Trust Co.,* 833 F.Supp. 288, 300 (S.D.N.Y.1993) ("[T]he duty of good faith ... cannot be used to create new contractual rights between the parties"); *Banco*

*Espanol de Credito v. Sec. Pac. Nat'l Bank,* 763 F.Supp. 36, 44 (S.D.N.Y.1991) ("The implied covenant does not 'operate to create new contractual rights.' ") (*quoting Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 767 (S.D.N.Y.1990)). Thus, "[c]ourts have generally been reluctant to find a breach of the implied covenant of good faith when doing so reads so much into the contract as to create a new term or when alleged misconduct is expressly allowed by the contract." *Keene Corp. v. Bogan,* No. 88 Civ. 0127(MBM), 1990 WL 1864, \*14, 1990 U.S. Dist. LEXIS 220, at \*43 (S.D.N.Y.1990).

 As correctly noted by the Bankruptcy Court, and as set forth above, the Intercreditor Agreement's interlocking definitions allowed Wachovia to amend the Revolving Credit Agreement to include a term loan, since the Appellants agreed to be subordinate to all obligations "of every kind, nature and description" owing to the Lenders by Musicland under an amended Revolving Credit Agreement. The Court cannot employ the covenant of good faith and fair dealing to impose on the parties obligations that are inconsistent with the express terms of the Intercreditor Agreement. *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,* 294 F.3d 383, 394–95 (2d Cir.2002).

*Carvel Corp. v. Baker,* 79 F.Supp.2d 53 (D.Conn.1997), *Bank of China v. Chan,* 937 F.2d 780 (2d Cir.1991), and *Kham & Nate's Shoes No. 2 v. First Bank,* 908 F.2d 1351 (7th Cir.1990), cited by Appellants, do not require a different result. In none of those cases did the contracts at issue permit the conduct allegedly breaching the implied covenant of good faith and fair dealing. Those cases demonstrate that where a contract is "silent," the court may, in a proper case, fill a gap. *See Carvel Corp.,* 79 F.Supp.2d at 62 & n. 6; *Bank of China,* 937 F.2d at 789; *Kham & Nate's Shoes No. 2,* 908 F.2d at 1357. Here, the

Intercreditor Agreement was not silent, but rather, it permitted Wachovia to enter into amendments, as provided in Section 4.3.

### Affiliated Refinancing Has Not Been Established

 Appellants have contended that the Harris Loan was an improper "Affiliated Refinancing." Appellants did not allege that Harris is an affiliate of Musicland or of its corporate parent Sun. While Harris is alleged to have had a working relationship with Sun, Compl. ¶ 8, the Complaint alleges no facts to establish that Harris was, in any way, related to Musicland or Sun in terms of its corporate structure so as to be considered an affiliate.

The Appellants have also failed to sufficiently plead a factual basis for the conclusory allegation that the Harris Loan was a "charade." As was recognized by the Bankruptcy Court, a plaintiff must plead more than "labels and conclusions," and "a formulaic recitation of the elements of a cause of action will not do." *Buena Vista,* 374 B.R. at 119 (*citing Bell Atlantic Corp. v. Twombly,* —— U.S. ——, ——, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)). Instead, the plaintiff "must amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007). Here, the only fact asserted in the Complaint to support the alleged "charade" is that Sun guaranteed the Harris Loan. The Appellants, however, expressly consented to the "taking" of "guarantees" in Section 4.3 and, while affiliate loans may have been limited, there is no such limitation in the Intercreditor Agreement against guarantees. Numerous Musicland affiliates, including Suncoast Holding Corp., guaranteed the Obligations arising thereunder. If the Appellants wanted to limit guarantees in the future, they could and should

have expressly done so, as they did with respect to affiliate loans. *See, e.g., RJE Corp. v. Northville Indus. Corp.,* 329 F.3d 310, 315 (2d Cir.2003) (concluding that the inclusion of certain requirements in one section of a contract but not another manifested the intention that such requirements would not be part of the latter section). Instead, in Section 4.3 of the Intercreditor Agreement, the Appellants agreed that the Lenders could take guarantees.

The Appellants have failed to establish that the Harris loan was affiliated financing.

### The Bankruptcy Court Did Not Err in Dismissing the Tort Claims

 To allege a claim for aiding and abetting a conversion, Appellants must sufficiently allege that a conversion has occurred. *Calcutti v. SBU, Inc.,* 273 F.Supp.2d 488, 493 (S.D.N.Y.2003). A "conversion is the 'unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" *Vigilant Ins. Co. v. Housing Auth.,* 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995) (*quoting Employers' Fire Ins. Co. v. Cotten,* 245 N.Y. 102, 105, 156 N.E. 629 (1927)). Thus, to state a claim for conversion, a plaintiff must allege (1) legal ownership or an immediate superior right of possession to a specific identifiable thing; and (2) that the defendant exercised an unauthorized dominion over the thing in question, to the exclusion of the plaintiff's rights. *See Independence Disc. Corp. v. Bressner,* 47 A.D.2d 756, 365 N.Y.S.2d 44, 46 (App.Div.1975).

Appellants have alleged that Harris was improperly paid from proceeds of inventory constituting Appellants' collateral. Compl. ¶ 63. The allegation, even if assumed to be true, is insufficient on its face to state a claim for conversion, because it fails to identify the specific proceeds that were allegedly converted.

 It is well-settled New York law that an action for the conversion of monies is "insufficient as a matter of law unless it is alleged that the money converted was in specific tangible funds of which claimant was the owner and entitled to immediate possession." *Ehrlich v. Howe,* 848 F.Supp. 482, 492 (S.D.N.Y.1994). In other words, the "money must be part of a separate, identifiable, segregated fund in order to bring an action for conversion." *United Republic Ins. Co. v. Chase Manhattan Bank,* 168 F.Supp.2d 8, 19 (N.D.N.Y.2001) (*citing High View Fund L.P. v. Hall,* 27 F.Supp.2d 420, 429 (S.D.N.Y.1998)). The Complaint contains no such allegations (perhaps because Harris was not repaid with inventory proceeds but rather with a $25,000,000 advance by the Lenders under the Revolving Credit Agreement), as claimed by Appellees. Appellees' Br. at 40. The tort claims, together with their aiding and abetting allegations, were appropriately dismissed.

 In addition, Appellants' aiding and abetting claim is a restatement of its breach of contract claim. Appellants allege that Wachovia aided and abetted Harris' conversion by "the devising and implementing of Amendment No. 8 and participation in causing Musicland to pay off the Harris Term Loan," which is the alleged predicate for the breach of contract claims. Compl. ¶ 68. Under New York law, "a cause of action for conversion cannot be predicated on a mere breach of contract." *Fesseha v. TD Waterhouse Investor Servs., Inc.,* 305 A.D.2d 268, 761 N.Y.S.2d 22, 24 (App.Div.2003). Here, Appellants' conversion claim "allege[s] no independent facts sufficient to give rise to tort liability." *Yeterian v. Heather Mills, N.V. Inc.,* 183 A.D.2d 493, 583 N.Y.S.2d 439, 440 (App.Div.1992). Accordingly, the

claims for conversion and aiding and abetting a conversion were appropriately dismissed.

 Similarly, the claim for tortious interference is essentially a restatement of the breach of contract claim, relying upon the same factual premise, namely, that Wachovia interfered with the Trade Security Agreement by entering into Amendment No. 8 and permitting repayment of the Harris Loan. "It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *MCI WorldCom Commc'ns, Inc. v. HSG/ATN, Inc. (In re WorldCom, Inc.)*, 361 B.R. 697, 719 (Bankr.S.D.N.Y. 2007) (*citing Clark–Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987)). Here, the tortious interference claim "adds nothing by way of legal liability, and only seeks to explain the possible motives of defendants" for their alleged breach of contract. *Miller v. Vanderlip*, 285 N.Y. 116, 125, 33 N.E.2d 51 (1941). Appellants "may not split [their] causes of action based upon a single grievance." *Id.*

### Conclusion

For the reasons set forth above, the Bankruptcy Court's Order and Judgment is affirmed in its entirety, with costs.

It is so ordered.